COMPTROLLER OF THE TREASURY *v.*
MARYLAND SPECIALTY WIRE, INC.

[No. 8, September Term, 1977.]

*Decided October 17, 1977.*

The cause was argued before GILBERT, C. J., and MORTON and LOWE, JJ.

*Paul S. Sugar, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Stephen M. Cordi, Assistant Attorney General,* on the brief, for appellant.

*Richard W. Emory*, with whom were *Benson Everett Legg* and *Venable, Baetjer & Howard* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Taxation, the inevitable cost we bear for a civilized society,[1] is, "[t]he art of so plucking the goose as to procure the most feathers with the least possible hissing."[2] The "plucking" of $8,290.12 in retail sales tax,[3] in the case now before us, led, not only to a great deal of "hissing" by the taxpayer, but the defeat of the Comptroller of the State Treasury's assessment before the State Tax Court and the Circuit Court for Baltimore County.

As the matter reaches us, it is the Comptroller, the appellant, whose feathers have been plucked, and who is hissing rather than the taxpayer. We are asked to reverse the judgment of the circuit court and reinstate the assessment of the additional tax upon Maryland Specialty Wire, Inc., the appellee.

We shall not do so, however, because we are of the view that both the circuit court and the tax court were correct in their respective holdings. Accordingly, for the reasons set forth *infra*, we affirm the judgment.

The question put to us is:

> Are diamond and tungsten carbide core dies, purchased by the appellee, excluded from the scope of the Maryland Retail Sales Tax Act because they are destroyed in manufacturing, within the meaning of Md. Ann. Code art. 81, § 324 (f) (ii)?

Phrased in another form, the question is, are such dies, which have a relatively short use-life, more like a grinding wheel and, thus, exempt from the taxation, or are they more like a tool which is broken or worn out and, consequently, within the ambit of the tax?

---

1. Compañiá General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U. S. 87, 100, 48 S. Ct. 100, 72 L. Ed. 177 (1927).
2. An 18th Century French maxim attributed to Jean Baptiste Colbert.
3. Plus penalty and interest.

The facts from which this case arose were presented to the Tax Court, and the circuit court by way of stipulation, with some "live" testimony being supplied at the Tax Court level. We summarize both the stipulation and testimony as follows:

Appellee is engaged in the manufacture of wire from steel alloys drawn through dies purchased for that purpose. On October 4, 1971, the Comptroller assessed against appellee the amount of $14,155.14 and penalty and interest thereon for allegedly unpaid sales and use taxes. Part of the assessment has since been resolved, but $8,290.12, the amount related to appellee's purchases of diamond and tungsten carbide core wire extrusion dies, remains in controversy.

When appellee's application for revision of the assessment was denied, it applied for and was granted a formal hearing before the Comptroller's duly designated Hearing Officer. The result was that the dies were held to be taxable, and appellee's application for revision of the assessment was denied. Within thirty days thereafter, appellee appealed the Comptroller's decision to the Maryland Tax Court.

The wire manufactured by appellee varies from a diameter of approximately one-quarter inch to approximately four-thousandths of an inch. The wire is produced by reducing it in diameter. It is drawn sequentially through a series of dies with progressively smaller diameter holes. Each die is a circular steel casing, housing in its center a core of either a very small diamond or a small piece of tungsten carbide. The hole in the die through which the wire is drawn is made by piercing the diamond or tungsten with a laser beam.

The wire is progressively extruded through a series of smaller diameter dies until the desired diameter is achieved. The drawing process is conducted at speeds of up to thousands of feet per minute, producing friction, heat, and abrasion upon the surface of the diamond or tungsten carbide cores. The result is that the surface of the diamond or tungsten deteriorates and enlarges in diameter until it is

out of tolerance. When that happens, the die is removed from the extrusion machine and the hole in the die is refinished or rounded to a slightly larger size than it was prior to its use in the drawing operation.

The use of a diamond die in a phase of extrusion averages two and a half days, while a tungsten carbide die lasts about eight hours. A die with a diamond core, on average, can be refinished or rounded and reused nine or ten times for larger diameter drawings. A die with a tungsten carbide core normally can be refinished or rounded and reused forty or forty-five times for larger diameter drawings. After the dies can no longer be refinished, they are scrapped. The steel casings which house the dies are not affected by the wire drawing process, but they are unsuitable for use in resetting new cores, and for practical purposes they have no further use.

Excluding the time that a die is out of service for refinishing or rounding, the average useful life of a die with a diamond core is twenty-five days consisting of twenty-four hours per day use. The average useful life of a die with a tungsten carbide core is fifteen days of twenty-four hours per day use.

The celerity with which dies are expended may be gleaned from a comparison with refractories which come into direct contact with molten metals in a modern steel blast furnace. The useful life of such refractories is at least two and a half to five years. The useful life of grinding wheels used by appellee in its manufacturing operations is between thirty and sixty days of continuous operation. The grinding wheels of the appellee, through usage, are completely destroyed by abrasion.

At the hearing before the Maryland Tax Court, the Agreed Statement of Facts was supplemented by the testimony of Mr. Richard Nash, the president of appellee. Mr. Nash testified as to the deterioration of the wire drawing dies caused by abrasion, pressure, and temperatures created in the extrusion process. On cross-examination, Mr. Nash also testified that abrasion is the cause of any wearing away of virtually anything.

The Tax Court ordered the deficiency assessment against appellee abated and canceled. The Comptroller then filed a timely appeal to the circuit court, where the case was heard by Judge Edward A. DeWaters, Jr., who affirmed the decision of the Tax Court.

Md. Ann. Code art. 81, § 324 (f), the statute that forms the basis of the instant appeal provides in pertinent part:

"(f) 'Retail sale' and 'sale at retail' shall mean the sale in any quantity or quantities of any tangible personal porperty [sic] or service taxable under the terms of this subtitle. Said term shall mean all sales of tangible personal property to any person for any purpose other than those in which the purpose of the purchaser is ... to destroy the property so transferred in the manufacturing, assembling, processing or refining of other tangible personal property to be produced for sale .... *Tangible personal property shall be considered to be destroyed in manufacturing, processing, assembling, refining ... if it is changed in nature by reason of its use in a relatively short period of time, as the nature of coal is changed by burning, as refractories which come in direct contact with molten metals are changed by heat and abrasion, as grinding wheels are reduced to dust, as acids are changed by contamination, and so forth.* Property which is broken or mutilated shall not be considered to be destroyed. *Tangible personal property shall not be considered to be destroyed in such operations if its value as property is ordinarily dissipated through the gradual wear or tear incident to its use.* Machinery and small tools shall not be considered to be destroyed in such operations ...." [4] (Emphasis supplied.)

---

4. *See also* State of Maryland, Comptroller of the Treasury, Tax Rules and Regulations, Retail Sales and Use Tax Rule #63, which reads:

"An amendment to Section 324(f) of the Retail Sales Tax Act, effective July 1, 1966, exempts sales of tangible personal property which is destroyed in the manufacturing, assembling, processing

The General Assembly, in apparent response to the decision of the Court of Appeals in *Comptroller v. American Cyanamid Co.*, 240 Md. 491, 214 A. 2d 596 (1965), holding that former Comptroller's Rule 63, exempting property "consumed" in manufacture went beyond the power conferred on the Comptroller, amended Md. Ann. Code art. 81, § 324 (f) by 1966 Md. Laws, ch. 104, effective July 1, 1966.

The Comptroller reads the current § 324 (f) (6) as the sluice to strike pay dirt, while the appellee interprets that section to be an obstruction which prevents the Comptroller's exacting the payment of the tax. Neither party disputes that the appellee's purchase of the diamond and tungsten carbide core dies may not be taxed unless they fall without the exceptions embodied in § 324 (f).

The rule relating to the strict construction of a tax exemption statute is not applicable to this case because, "the exclusion of tangible personal property purchased for the purpose of resale in its original form, or for the purpose of incorporation into a finished product," or where it is destroyed in the manufacture process "is by force of the

or refining of other tangible personal property to be produced for sale. The terms 'manufacturing', 'assembling', processing'. and 'refining' shall not include (a) maintaining, servicing or repairing; (b) testing finished products; or (c) providing for the comfort or health of employees.

"Property shall be considered to be destroyed in manufacturing, processing, assembling or refining if it is changed in nature by reason of its use in a relatively short period of time as the nature of coal is changed by burning, as refractories which come in direct contact with molten metals are changed by heat and abrasion, as grinding wheels are reduced to dust and as acids are changed by contamination, and so forth. Property which is broken or mutilated shall not be considered to be destroyed.

"Not every item which is rendered unfit for use in a short period of time or even by a single use qualifies for the exemption. In order to qualify, the use must effect a change in the nature of the item. Tools which are broken or worn, molds which are broken, blades the cutting edges of which are dulled, are among those items that do not qualify though used only once. In no instance shall the deterioration of items through ordinary wear or tear make such items eligible for this exemption. Items rendered useless by gradual wear and tear are beyond the scope of the exemption.

"Items which do qualify for the exemption may be purchased tax free through the issuance by the vendee of a resale certificate to the vendor."

definition," Md. Ann. Code art. 81, § 324 (f), "and not by inclusion in the exemptions set out in" Md. Ann. Code art. 81, § 326. *Baltimore Foundry & Machinery Corp. v. Comptroller*, 211 Md. 316, 319, 127 A. 2d 368, 369 (1956); *Comptroller of Treasury v. American Can Co.*, 208 Md. 203, 208, 117 A. 2d 559, 561 (1955). The rule that is applicable, however, is, where there is doubt as to the breadth of a tax statute, the act should be construed most strongly in favor of the taxpayer and against the taxing authority. *Gould v. Gould*, 245 U. S. 151, 153, 38 S. Ct. 53, 62 L. Ed. 211 (1917); [5] *Baltimore Foundry & Machinery Corp. v. Comptroller, supra*, 211 Md. at 319-20, 127 A. 2d at 369; *Comptroller of Treasury v. American Can Co., supra*, 208 Md. at 208, 117 A. 2d at 561; *Comptroller of Treasury v. Rockhill, Inc.*, 205 Md. 226, 234, 107 A. 2d 93, 98 (1954); *Maryland Unemployment Compensation Board v. Albrecht*, 183 Md. 87, 92, 36 A. 2d 666, 668-69 (1944); *Magruder v. Hospelhorn*, 173 Md. 62, 72, 194 A. 839, 844 (1937).

We have not been directed to, nor have we found a prior Maryland appellate decision interpreting § 324 (f) (ii).[6] A review of the tax statutes and judicial interpretation thereof by our sister States has proven equally unhelpful as none are sufficiently analogous to be of assistance, with one apparent guide, if not exception, *Hudson Pulp and Paper Corp. v. Johnson*, 147 Me. 444, 88 A. 2d 154 (1952).

The Court, in *Hudson*, was called upon to decide whether a use tax levied upon lubricating oils and greases used to lubricate machinery, and certain wires and felts used to

5. Some other United States Supreme Court cases so holding are: McFeely v. Comm., 296 U. S. 102, 56 S. Ct. 54, 80 L. Ed. 83 (1935); United States v. Merriam, 263 U. S. 179, 44 S. Ct. 69, 68 L. Ed. 240 (1923); United States v. Field, 255 U. S. 257, 41 S. Ct. 256, 65 L. Ed. 617 (1921).

6. In the case of Zenith Litho Reproductions, Inc., and Craftsman Press, Inc. v. Comptroller, Md. Tax Ct. (Sales Tax Nos. 6 & 7, 1970), [1970] 2 Md. Tax Rep. (CCH) § 200-603, the Tax Court held that certain aluminum lithographic plates purchased by Craftsman Press were not subject to sales taxation because after 10,000 to 100,000 prints, each plate would no longer produce prints of the required quality, and were thus consumed and scrapped. The Tax Court decided that the plates were "destroyed" within the meaning of Section 324 (f) because they were changed in nature by reason of their use in a relatively short period of time in the production of tangible personal property for sale. The case was settled in the Circuit Court for Prince George's County on other grounds.

manufacture paper were "destroyed" in the course of the process and, hence, outside the ambit of the Maine Sales and Use Tax Law. The applicable Maine statute, P.L. 1951, ch. 250, § 2 read:

> " 'Retail sale' or 'sale at retail' means any sale of tangible personal property in the ordinary course of business, for consumption or use, or for any purpose other than for resale in the form of tangible personal property. . . . 'Retail sale' and 'sale at retail' do not include the sale of tangible personal property which becomes an ingredient or component part of, or which is consumed or destroyed or loses its identity in the manufacture of, tangible personal property for later sale by the purchaser, but shall include fuel and electricity." [7]

The Supreme Judicial Court of Maine reasoned in interpreting the statute at 147 Me. 444, 445-46, 88 A. 2d, 154, 155, that:

> "The lubricating oils and greases used to lubricate the machinery, and the wires and felts used in connection with and on the machinery employed to manufacture paper, were all expendibles. . . . As to the oils and greases it is self evident that their use for the intended purpose destroys them. True it is that the wires and felts are not completely annihilated by the intended use, but as a result of chemical action and mechanical abrasion both wires and felts are rendered useless after varying but relatively short periods of use; the wires having a life of one to four weeks, the wet felts six to ten days and the dry felts up to five months. After these periods the felts and wires become of no use in the paper-making business.

---

7. The statute has since been revised. *See* Me. Rev. Stat. tit. 36, § 1752, 11, which adds in pertinent part that tangible personal property is considered "consumed or destroyed" or "loses its identity" in manufacture if it has a normal physical life expectancy of less than one year as a usable item in the use to which it is applied.

> We hold that these articles of personal property by use for the purposes intended are consumed or destroyed within the meaning of those words as used in the Act. . . ."

The statute before us, in the present case, Md. Ann. Code art. 81, § 324 (f) defines "destroyed" as "changed in nature by reason of its use in a relatively short period of time." The legislature made manifest what it meant by specific examples, such as "coal . . . changed by burning," "refractories which come in direct contact with molten metals [and] are changed by heat and abrasion," "grinding wheels" which by use "are reduced to dust." The legislature, however, did not halt there. It went on to say, after stating the examples, "and so forth," obviously meaning that the few illustrations in the statute are not to be considered as all inclusive, but rather that other tangible personal property which is similarly changed in nature by reason of its use in manufacturing is to be embraced within the exception. The diamond and tungsten carbide core dies used by the appellee in the extrusion of metal are "changed in nature" through heat and abrasion into ground dust in similar fashion as grinding wheels are reduced to dust by the same factors.

We believe the clear import of the language employed by the General Assembly in § 324 (f) does not demand that in order for tangible personal property to qualify for exclusion from the Retail Sales Tax Act that its prior identity must be totally obliterated, but only that its nature is changed. Merely because the die cores in the instant case are still recognizable as such does not mean that they are taxable. We perceive little, if any, difference between the effect of heat and abrasion on the die cores as distinguished from their effect on grinding wheels, which even though reduced to dust, the remnant is, nevertheless, recognizable as having been a grinding wheel.

The Comptroller does not contend in this case that any "change in nature" did not occur to the die cores within a "relatively short period of time." Indeed, both parties have stipulated that the average useful life of a diamond core die is twenty-five days of continuous operation, and that the

average useful life of a tungsten carbide core die is fifteen days of continuous operation. The grinding wheels used by appellee in its business have a useful life of between thirty and sixty days of continuous operation. The grinding wheels, as we have seen, are included within the exception articulated in § 324 (f).

Accepting, as we do, the premise that the dies used by appellee are more like "grinding wheels" than "tools," as both nouns are utilized in § 324 (f), we look to the use-life of the grinding wheel to determine what is meant by a "relatively short period of time." The stipulation contains the information that notwithstanding the use by appellee of "a cooling process and lubricants" to reduce heat and friction on the grinding wheels, the useful life of the grinding wheels of appellee "is between 30 and 60 days of continuous operation." We infer that the useful life of a diamond or tungsten carbide core die must by equation be longer than sixty days in order for it to be taxable. We have previously noted that the useful life of such dies does not even approach the sixty-day mark, much less exceed it. We conclude, therefore, that the use-life of the dies, in the case at bar, is expended within "a relatively short period of time," and, thus, falls within the scope of the statutory exception.

The Comptroller argues that § 324 (f) makes unmistakable that tangible personal property shall not be considered destroyed if its value is "ordinarily dissipated through the gradual wear and tear incident to its use." The fallacy in that approach is that the disintegration of the dies is not gradual, but occurs within the "relatively short period of time" prescribed by the statute.

We hold that the diamond and tungsten carbide core dies of the appellee are "destroyed" within the meaning of Md. Ann. Code art 81, § 324 (f) in that they are "changed in nature by reason of ... [their] use in a relatively short period of time." The Circuit Court for Baltimore County did not err in affirming the order of the Tax Court which directed an abatement of the assessment.

*Judgment affirmed.*
*Costs to be paid by the appellant.*